SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-09-0322-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2008-128068-001 |
| PETE J. VANWINKLE, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Paul J. McMurdie, Judge

**AFFIRMED**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Criminal Appeals/Capital Litigation Section
          Ginger Jarvis, Assistant Attorney General
Attorneys for State of Arizona

MICHAEL J. DEW, ATTORNEY AT LAW                              Phoenix
     By   Michael J. Dew
Attorney for Pete J. VanWinkle
_____


**B R U T I N E L**, Justice

¶1      In 2009, Pete J. VanWinkle was sentenced to death for the first degree murder of Robert Cotton. We have jurisdiction over this automatic appeal under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2010).

¶2      On May 1, 2008, when Maricopa County Jail inmates VanWinkle and Robert were out of their cells for recreation time, jail videos show Robert, who walked with a visible limp, climbing the stairs to the second level of cells. Robert looked backward twice and appeared to talk to VanWinkle.[2] When he reached the second tier, Robert stood outside VanWinkle's cell. VanWinkle ascended the stairs less than a minute later, appearing to speak to Robert, who then walked into the cell.

¶3      Before VanWinkle entered his cell, he walked into a shower area next door. A few seconds later, he entered his cell. For about one minute, VanWinkle and Robert stood in the cell outside the view of the jail surveillance camera. When they came back into view, VanWinkle was on top of Robert, hitting him. After a brief struggle, Robert became still.

¶4      Then, for approximately eighteen minutes, VanWinkle continued to beat Robert, strangling him, stomping on him, punching him, and jumping up and down on his motionless body. The video reflects that VanWinkle took several breaks to rest and wipe the blood from his hands before resuming the attack.

¶5      VanWinkle then dragged Robert's body from the cell and

---

[1]    We view the facts "in the light most favorable to upholding the verdicts." *State v. Chappell*, 225 Ariz. 229, 233 ¶ 2 n.1, 236 P.3d 1176, 1180 n.1 (2010).
[2]    The surveillance equipment did not record audio.

tried to push it through the railing onto the first level. When he could not do so, VanWinkle went downstairs, got a drink of water, and waited for jail staff to respond. Within minutes they handcuffed VanWinkle and tried unsuccessfully to revive Robert.

## II. ISSUES ON APPEAL

### A. Denial of Motions to Continue

¶6 VanWinkle contends that the trial court abused its discretion by denying his successive motions to continue the trial. He argues that not postponing his trial date prevented his counsel from preparing to present mitigating evidence.

¶7 VanWinkle is not now contending that he was denied effective assistance of counsel, as he acknowledges that such claims cannot be raised on direct appeal. *See State v. Spreitz*, 202 Ariz. 1, 3 ¶ 9, 39 P.3d 525, 527 (2002). Instead, he contends that the trial court abused its discretion in denying a continuance because it left his counsel unprepared. *See, e.g.*, *State v. Barreras*, 181 Ariz. 516, 520, 892 P.2d 852, 856 (1995). We will not find an abuse of discretion unless VanWinkle demonstrates prejudice. *See id.; see also State v. Lamar*, 205 Ariz. 431, 437-38 ¶ 32, 72 P.3d 831, 837-38 (2003) (requiring defendant to establish prejudice when trial court denied continuance).

¶8 A party requesting a continuance must demonstrate that

3

"extraordinary circumstances exist" and "state with specificity the reason(s) justifying" a continuance. Ariz. R. Crim. P. 8.5. When a trial court grants a continuance, it must state on the record specific reasons for doing so. *Id*.

¶9　　In each of his three motions requesting continuances, VanWinkle argued that his lead counsel had a grueling schedule that prevented him from adequately preparing for trial in this case; he also asserted generally that counsel needed more time for trial preparation and investigation of mitigation evidence. In denying the first two motions, the trial court acknowledged counsel's busy schedule, but instructed that it would not grant a motion containing "only conclusory statements such as . . . additional time is needed to prepare for trial or investigate the matter." Despite the court's warnings, VanWinkle continued to file non-specific motions. In his third motion, counsel argued that he needed to interview state witnesses and to conduct pretrial investigation into mitigation topics, that "several motions remain[ed] to be written," and that some of VanWinkle's family members had not yet been interviewed.

¶10　　Although we recognize that defense counsel must be allowed sufficient time to prepare, *see State v. Narten*, 99 Ariz. 116, 120, 407 P.2d 81, 83 (1965), we cannot conclude on this record that the trial court abused its discretion. As the court repeatedly noted, counsel failed to abide by Rule 8.5's

4

specificity requirements. Without this information, the trial court could not meet its own Rule 8.5(b) obligation even if it were inclined to grant a continuance. *See* Ariz. R. Crim. P. 8.5(b) (requiring trial court to state on the record specific reasons for granting a continuance).

¶11 On appeal, VanWinkle argues that he could not provide more detail because his counsel did not have time enough to investigate to know what potential mitigation issues required more attention. But, as the trial court noted, the defense had been engaged in investigating the case for more than a year when it filed these motions. And counsel had several ways he could have fulfilled Rule 8.5's requirements even absent full knowledge of what evidence might exist. As the trial court suggested in denying VanWinkle's first motion, he could have detailed what members of the defense team had done to prepare for trial and outlined tasks they had yet to complete. He could have made an offer of proof to explain what evidence he believed additional investigation would uncover. *See State v. Benge*, 110 Ariz. 473, 477, 520 P.2d 843, 847 (1974) (acknowledging usefulness of offer of proof to justify continuance). And if VanWinkle was concerned about disclosing matters of trial strategy or work product, he could have requested an ex parte hearing. *See* Ariz. R. Crim. P. 15.9(b) (allowing ex parte proceedings when defendant requires confidentiality).

¶12     VanWinkle has also failed to establish prejudice from the denials. Counsel had approximately eighteen months to prepare for a trial that lasted just ten days from opening statements to the jury's penalty phase verdict. Evidence at trial involved showing the video-recording of the crime and the testimony of sixteen witnesses, including VanWinkle himself. Counsel cross-examined witnesses and presented affirmative defenses based on self-defense and justification. VanWinkle has not identified any witness or other evidence that could have been presented, or presented more effectively, had his counsel been afforded more preparation time.

¶13     At trial, a mitigation specialist assisted his defense team, and counsel had available several traditional sources of mitigation. Because VanWinkle, who was twenty-six when he murdered Robert, had been incarcerated almost continuously from the time he was eighteen, much of his social history was fully documented. And as the State pointed out after compiling its own mitigation report, nothing suggests that VanWinkle's upbringing had been extraordinary or that his childhood posed any particular difficulty for investigating possible mitigation. VanWinkle maintained close relationships with his mother and an uncle, whom his counsel interviewed. He had been evaluated by mental health professionals whose reports were made available to the defense. Additionally, VanWinkle cooperated with his

defense counsel, testifying on his own behalf and complimenting his lead attorney's dedication.

¶14    This record does not support VanWinkle's suggestion that, but for the trial court's denial of a continuance, he would have been able to present substantial additional mitigation.

## B. Sufficient Evidence of Premeditation

¶15    VanWinkle contends the State presented insufficient evidence of premeditation. Viewing the facts in the light most favorable to sustaining the verdict, we review whether substantial evidence supports the jury's finding. *See State v. Bearup*, 221 Ariz. 163, 167 ¶ 16, 211 P.3d 684, 688 (2009). To prove premeditation, the state must show that a defendant intended to kill another person, and "after forming that intent . . . reflected on the decision before killing." *State v. Thompson*, 204 Ariz. 471, 479 ¶ 32, 65 P.3d 420, 428 (2003). Circumstantial evidence may establish that the defendant reflected on the killing. *Id.* at 480 ¶ 33, 65 P.3d at 429.

¶16    The State presented ample evidence from which the jury could infer that VanWinkle lured Robert to his cell to kill him. Importantly, the jury watched surveillance video from which it could infer VanWinkle's intent. *See Ferguson v. State*, 704 S.E.2d 470, 473 (Ga. Ct. App. 2010) (surveillance video prior to theft allowed jury to infer defendant's state of mind); *State v.*

7

*Albercht*, 809 So. 2d 472, 478 (La. Ct. App. 2002) (video recording of event allowed court to infer perpetrator's mental state); *State v. Davis*, 318 S.W.3d 618, 622, 640 (Mo. 2010) (video of rape and murder of "supreme probative value" when defendant contended victim's suffocation was accidental). The video does not portray any aggressive conduct by the victim, and the jury could have concluded that VanWinkle's calm demeanor suggested that he had planned the killing. *See State v. Braxton*, 531 S.E.2d 428, 444-45 (N.C. 2000) (holding testimony that inmate was calm immediately following murder relevant evidence that attack was premeditated and not in self defense). The jurors could have concluded that VanWinkle acted with premeditation upon watching his prolonged, brutal attack, during which he alternated between beating, strangling, and jumping up and down on the victim, he took breaks, and he renewed his attack against his unresisting victim *State v. Gulbrandson*, 184 Ariz. 46, 65, 906 P.2d 579, 598 (1995) (finding "protracted, brutal, and . . . sustained" attack on victim evidence of premeditation).

¶17    Evidence of VanWinkle's statements and knowledge preceding the attack also supported a finding of premeditation. Before VanWinkle was transferred into Robert's unit at the jail, he warned his mother that he planned to get into a fight and would likely experience a loss of privileges. Within two days

8

of the transfer, he killed Robert. *See State v. Dann*, 205 Ariz. 557, 565 ¶ 19, 74 P.3d 231, 239 (2003) (finding defendant's allusion to consequences of crime before its commission evidence of premeditation). Evidence also showed that VanWinkle was aware of jail surveillance practices, suggesting that he planned to kill Robert when he was least likely to be stopped. *See State v. Womble*, 225 Ariz. 91, 98 ¶ 21, 235 P.3d 244, 251 (2010) (finding defendant's taking steps to avoid being discovered during commission of crime evidence of premeditation).

## C. Other Acts Evidence

¶18 VanWinkle next contends the trial court erroneously permitted the State to present evidence of "other bad acts" he had committed while incarcerated. We review the admission of other act evidence for an abuse of discretion. *See State v. Dickens*, 187 Ariz. 1, 13-14, 926 P.2d 468, 480-81 (1996).

¶19 VanWinkle testified that "inmate rules" require prisoners to resolve disputes themselves without involving jail staff. He therefore testified that although facility rules would forbid fighting, when Robert entered his jail cell, the inmate rules gave VanWinkle no choice but to respond aggressively to the threat. On cross examination, the State asked VanWinkle to tell the jury about "some of those situations in prison where [he] chose not to follow the prison facility rules" and instead to abide by the inmate rules.

¶20    VanWinkle objected to this question and a hearing followed. The State argued that because VanWinkle brought up the inmate rules, he opened the door to inquiry into his decisions to violate formal facility rules. It further argued that because VanWinkle raised justification as a defense, the State was entitled to introduce evidence of other unprovoked violent attacks. The State then made an offer of proof, describing incidents in which VanWinkle struggled with a guard; attempted to kick another inmate; threatened an officer; struck another inmate (while armed with a shank); and attempted to hit an officer. The court ruled that the testimony was admissible, concluding that VanWinkle had put his character at issue, noting that because prison conduct was essential to VanWinkle's defense, specific incidents of conduct refuting that defense were relevant.

¶21    Although evidence of a person's character generally is not admissible to show conduct in conformity therewith, Ariz. R. Evid. 404(a), evidence of other acts may be admissible under Rule 404(b) to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of accident." Such evidence is admissible only when the evidence is relevant and the potential for prejudice does not substantially outweigh its probative value. *See* Ariz. R. Evid. 403. Additionally, the trial court is required to give a limiting instruction on its

use if so requested. *See State v. Lee*, 189 Ariz. 590, 599, 944 P.2d 1204, 1213 (1997).

¶22     Because VanWinkle claimed to kill Robert in self-defense pursuant to the inmate rules, the State was entitled to present evidence of other indiscriminate acts of violence to rebut this claim.

¶23     In *Lee*, this Court considered the relevance of a previous murder to disprove a defendant's self-defense claim. There, the defendant had robbed and murdered victims on two separate occasions. He contended, that "he was forced to shoot his robbery victims because they attacked him." *Id.* We affirmed that each murder was relevant to prove the defendant's intent regarding the other because "the unlikeliness of this [the defendant being forced to kill victims] happening twice tends to show that neither shooting was accidental." *Id.*

¶24     The State's presentation of other act evidence here was similarly relevant to show intent. Evidence that VanWinkle has, on several occasions, attacked others at the jail facility without justification supported the State's argument that VanWinkle did not act in self defense when he killed Robert. The other 404(b) admissibility requirements also were met. *See Lee*, 189 Ariz. at 599, 944 P.2d at 1213 (listing factors governing admission under Rule 404(b)). This evidence was not unduly prejudicial. The State's cross-examination of VanWinkle

11

related to these incidents was brief, comprising no more than four pages of transcript, the State did not elicit details about the attacks, and VanWinkle explained the circumstances of one incident. Additionally, the State did not belabor VanWinkle's past violence in arguments to the jury. Finally, VanWinkle did not request a limiting instruction and does not challenge any of the trial court's instructions that could relate to this evidence.

**D. Instruction on the (F)(6) Aggravator**

¶25 VanWinkle next argues that the trial court incorrectly defined "gratuitous violence" with respect to the (F)(6) (especially heinous or depraved) aggravating circumstance. At trial, he requested an instruction different from the one he now contends is correct under the law; accordingly we review this issue only for fundamental error. *See State v. Moore*, 222 Ariz. 1, 16 ¶ 85, 213 P.3d 150, 165 (2009). To establish fundamental error, VanWinkle must show there was error that went to the foundation of his case and denied him a fair trial, and that he was, in fact, prejudiced by the error. *See State v. Henderson*, 210 Ariz. 561, 568 ¶¶ 23-24, 569 ¶ 26, 115 P.3d 601, 608, 609 (2005).

¶26 The trial court instructed the jury that a defendant inflicts gratuitous violence by "us[ing] violence clearly beyond what was necessary to kill the victim." As VanWinkle correctly

12

points out, this instruction is inadequate under *State v. Bocharski*, 218 Ariz. 476, 494 ¶ 87, 189 P.3d 403, 421 (2008), because it omits reference to the defendant's state of mind. To prove gratuitous violence, the state must "show that the defendant continued to inflict violence after he knew or should have known that a fatal action had occurred." *Id*. (emphasis omitted).

¶27     But the trial court's error caused no prejudice because VanWinkle admitted that he continued to attack Robert after he determined that Robert had died. That admission eliminates the possibility that failing to instruct the jury on intent contributed to the verdict. *See Moore*, 222 Ariz. at 16-17, ¶¶ 86-87, 213 P.3d at 165-66 (finding no fundamental error when "no reasonable jury could fail to find" aggravator proven beyond a reasonable doubt); *State v. Murdaugh*, 209 Ariz. 19, 30 ¶ 51, 97 P.3d 844, 855 (2004) ("When 'a defendant stipulates, confesses or admits to facts sufficient to establish an aggravating circumstance, [the court] will regard that factor as established.'" (quoting *State v. Ring*, 204 Ariz. 534, 563 ¶ 93, 65 P.3d 933, 944 (2003) (alteration in *Murdaugh*))).

**E. Rebuttal to Mitigation**

¶28     VanWinkle also challenges the trial court's admission of rebuttal evidence that he had attacked and seriously injured another inmate ("the S. evidence") after he killed Robert.

13

Under A.R.S. § 13-751, any evidence offered to rebut the defendant's mitigation must be relevant to show that the defendant should not be shown leniency. *State v. Boggs*, 218 Ariz. 325, 339 ¶ 65, 185 P.3d 111, 125 (2008). This Court defers to the trial court's determination of relevance so long as the rebuttal is relevant to the "'thrust of the defendant's mitigation'" and not unduly prejudicial. *Id*. (quoting *State v. Hampton*, 213 Ariz. 167, 180 ¶ 51, 140 P.3d 950, 963 (2006)); *see also State v. Pandeli*, 215 Ariz. 514, 527-28 ¶ 43, 161 P.3d 557, 570-71 (2007) (explaining that Due Process Clause prohibits unbounded and limitless rebuttal evidence).

**¶29** During the penalty phase, VanWinkle's mitigation focused on the realities of prison life, both physically and socially. He asked the jury to consider mitigating that:

1. [He] committed the murder in a dangerous high-security jail environment in which he faced the constant danger of death or serious injury. The murder was a reaction to the stress of this environment.
2. The jail provided inadequate security procedures within the jails to prevent and respond to violence between the inmates.
3. Immersion in "prison culture" limits the number and type of inmate responses to threats, leaving inmates with few appropriate methods of response to personal violence or threats of violence.

He further argued that his moral culpability for the crime was reduced because Robert presented a "threat of danger," and he emphasized that inmates needed to protect themselves in jail.

14

Additionally, VanWinkle argued that his jail socialization taught him to respond to perceived threats on his own, without waiting for staff intervention.

¶30    In response, the State offered evidence that, after he killed Robert, VanWinkle was placed in a high-security unit, which did not allow him to have any direct contact with other inmates.   While housed in this unit, jail staff accidentally allowed VanWinkle into a recreation room at the same time as sixty-two-year-old S., who was described as aged beyond his years.   VanWinkle attacked S., strangling him from behind and punching him repeatedly in the head.   When the guards opened the door, S. crawled out of the room, bleeding profusely.

¶31    Following the attack, VanWinkle responded that he "had to do it" because S. was a sex offender.   Within a month, VanWinkle wrote a letter, saying he "wouldn't have passed up a chance to teach that creep what happens when you put your hands on a woman" and that S. was lucky the guards "caught on before [he] had the time to let out the air in his lungs forever."

¶32    VanWinkle argues that the S. evidence was irrelevant because he never claimed to be a "model inmate."   But the State did not offer it to rebut such a claim.   The thrust of VanWinkle's mitigation was that he was less responsible for murdering Robert because of jail culture and the need to protect himself.   Evidence of a similar, unprovoked attack on a

15

different victim was properly presented by the State in rebuttal.

¶33     Unlike his claims regarding Robert, VanWinkle did not contend — nor could he seriously argue — that S. posed a threat to him.  VanWinkle attacked S. from behind, and there is no evidence S. instigated the fight or attempted to fight back. Contrary to VanWinkle's claims that the jail environment required him to defend himself, he attacked relatively weaker and defenseless victims in the aged S. and Robert, who walked with a limp.

¶34     The attack on S. also undercut VanWinkle's argument that his actions were compelled by inmate rules.  There was no evidence that S. had done anything to VanWinkle or that he had any argument to settle.  VanWinkle's letter further confirmed that he did not attack S. because the inmate rules required it, but because he believed that sex offenders should be killed and that he had the right to do it.

¶35     We have previously approved the admission of evidence that rebutted mitigation relating to a defendant's motivation for committing a crime.  In *Pandeli*, the defendant's former girlfriends testified about past violent acts to counter the defendant's claim that he was impulsive due to mental illness. 215 Ariz. at 528 ¶ 45, 161 P.3d at 571.  The women's testimony evidenced an escalating pattern of violence inconsistent with

16

his mental illness mitigation. *Id*. In *State v. McGill*, the defendant offered mitigation that another person manipulated him into committing a murder. 213 Ariz. 147, 157 ¶ 42, 140 P.3d 930, 940 (2006). We concluded it was proper for the State to present rebuttal evidence showing that the defendant tried to put a contract on a witness's life because the evidence suggested he had acted on his own and not at another's behest. *Id*. ¶ 44. Finally, in *State v. Roque*, a defendant alleged that he killed the victim because the defendant was mentally ill. 213 Ariz. 193, 221 ¶ 111, 141 P.3d 368, 396 (2006). The State presented rebuttal evidence of the defendant's history of racism to show the murder was racially motivated and not a result of mental illness. *Id*.

¶36 The S. evidence similarly rebuts VanWinkle's claims that he was forced by inmate rules or the stress of prison life to kill Robert.

**G. Review of the Death Sentence**

¶37 Because this murder was committed after August 1, 2002, we review the jury's aggravation findings and imposition of the death sentence for an abuse of discretion. A.R.S. § 13-756(A). We will affirm if the record contains any reasonable evidence to support the jury's findings and sentence. *State v. Chappell*, 225 Ariz. 229, 242 ¶ 56, 136 P.3d 1176, 1189 (2010).

¶38 The State alleged three aggravating circumstances:

17

VanWinkle was an inmate of the Maricopa County Jail when he murdered Robert, *see* § 13-751(F)(7)(a); he had previously been convicted of a serious crime, *see* § 13-751(F)(2); and the crime was especially heinous and depraved, *see* § 13-751(F)(6). VanWinkle concedes the State proved the (F)(7)(a) and (F)(2) aggravators by presenting certified copies of his convictions and evidence that he was in custody at the time of the murder.

¶39    VanWinkle contends, however, that the State presented insufficient evidence that the murder was especially heinous and depraved, failing to prove that he used gratuitous violence or relished the murder. We disagree.

¶40    Proof that a defendant either employed gratuitous violence or relished the killing will suffice to establish that a murder was especially heinous or depraved. *See State v. Rienhardt*, 190 Ariz. 579, 590, 951 P.2d 454, 465 (1997). Here, there was sufficient evidence that VanWinkle both used gratuitous violence and relished the murder.

¶41    VanWinkle beat Robert for nearly twenty minutes, strangling him, punching him, beating his head against the floor, and jumping up and down on his motionless body. VanWinkle admitted that he began his attack with a choke hold, and medical testimony indicated Robert would have been asphyxiated within a few minutes. The surveillance video reflects that less than two minutes after VanWinkle began his

18

attack, Robert became motionless, apparently losing consciousness and dying thereafter. And VanWinkle testified repeatedly that he concluded at some point that Robert had died, yet he continued to beat him and tried to throw his body over the second floor railing. VanWinkle thus clearly continued to inflict violence after he knew he had killed Robert. This is the very definition of gratuitous violence. *See Bocharski*, 218 Ariz. at 494 ¶ 87, 189 P.3d at 421.

¶42 The jury could also readily conclude that VanWinkle relished the murder. Because the crime was video recorded, the jury could see VanWinkle's demeanor as he repeatedly jumped up and down on Robert before dragging him from the cell and attempting to throw him over the railing. VanWinkle shouted that he was "going to throw this motherfucker over the tier." *See State v. Runningeagle*, 176 Ariz. 59, 65, 859 P.2d 169, 175 (1993) (finding relishing when defendant laughed and bragged of "good fight" immediately after murder). The State played audio recordings of a jailhouse phone call in which VanWinkle described himself as "enrapture[d]" when he was killing Robert. Although the phone call took place nearly a year after the murder, VanWinkle clearly described how he was feeling at the time of the crime. *See State v. Greene*, 192 Ariz. 431, 441 ¶ 40, 967 P.2d 106, 116 (1998) (noting that statements after a crime that "provide clear insight into [the defendant's] state

of mind at the time of the killing" are evidence of relishing). From this evidence, the jury could readily conclude that, as evidenced by his words and actions, VanWinkle "savored or enjoyed the murder at or near the time of the murder." *Id*. at 441 ¶ 39, 967 P.2d at 116.

¶43       Given the relative weakness of VanWinkle's proffered mitigation and the proof of the three aggravating circumstances, the jury did not abuse its discretion in determining that death was the appropriate sentence.

## IV. CONCLUSION

¶44       For the foregoing reasons, we affirm VanWinkle's conviction and sentence.[3]


_____
                    Robert M. Brutinel, Justice

CONCURRING:

_____
Rebecca White Berch, Chief Justice


_____
Scott Bales, Vice Chief Justice


_____
A. John Pelander, Justice

_____

[3]    VanWinkle raises eighteen issues to avoid preclusion on federal review.  His statements of those issues and the cases he cites rejecting his contentions are presented verbatim in the Appendix.

**APPENDIX**

1. The death penalty is *per se* cruel and unusual punishment. *Gregg v. Georgia*, 42 U.S. 153, 186-87, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992); *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983).

2. Execution by lethal injection is cruel and unusual punishment. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

3. The death statute is unconstitutional because it fails to guide the sentencing jury. *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

4. The statute unconstitutionally fails to require either cumulative consideration of multiple mitigating factors or that the jury make specific findings as to each mitigating factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995); *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994); *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

5. Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

6. Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death sentence. *State v. West*, 176 Ariz. 432, 454, 862 P.2d 192, 214 (1993); *Greenway*, 170 Ariz. at 162, 823 P.2d at 31.

7. Arizona's death statute is unconstitutionally defective because it fails to require the State to prove that death is appropriate. *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

8.  The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

9.  The Constitution requires a proportionality review of a defendant's death sentence. *Salazar*, 173 Ariz. at 416, 844 P.2d at 583; *State v. Serna*, 163 Ariz. 260, 269-70, 787 P.2d 1056, 1065-66 (1990).

10. There is no meaningful distinction between capital and non-capital cases. *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

11. Applying a death statute enacted after the Supreme Court's decision in *Ring II* violates the *ex post facto* clauses of the federal and state constitutions and A.R.S. § 1-244. *Ring III*, 204 Ariz. at 545-47 ¶¶ 15-24, 65 P.3d at 926-928.

12. The death penalty is cruel and unusual because it is irrationally and arbitrarily imposed and serves no purpose that is not adequately addressed by life in prison. *State v. Pandeli*, 200 Ariz. 365, 382 ¶ 88, 26 P.3d 1136, 1153 (2001), *vacated on other grounds, Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

13. Arizona's death penalty statute is unconstitutional because it requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. *Walton v. Arizona*, 497 U.S. 639, 648, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996); *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995). *State v. Tucker* (*"Tucker II"*), 215 Ariz. 298, 160 P.3d 177 (2007).

14. The death penalty is unconstitutional because it permits jurors unfettered discretion to impose death without adequate guidelines to weigh and consider appropriate factors and fails to provide principled means to distinguish between those who deserve to die or live. *State v. Johnson*, 212 Ariz. 425, 440 ¶ 69, 133 P.3d 735, 750 (2006).

15. The trial court improperly omitted penalty phase instructions that the jury could consider mercy or sympathy in evaluating the mitigation evidence and determining whether to sentence the defendant to death. *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-17 (2005).

16. The jury instruction that required the jury to unanimously determine that the mitigating circumstances were "sufficiently substantial to call for leniency" violated the Eighth Amendment. *State v. Ellison*, 213 Ariz. 116, 139 ¶¶ 101-102, 140 P.3d 899, 922 (2006).

17. The refusal to permit voir dire of prospective jurors regarding their views on specific aggravating and mitigating circumstances violates Appellant's rights under the Sixth and Fourteenth Amendments. *State v. Johnson*, 212 Ariz. 425, 440 ¶¶ 29-35, 133 P.3d 735, 750 (2006).

18. Refusing to instruct the jury to permit the introduction of evidence and argument regarding residual doubt violated Appellant's rights under the Sixth, Eighth, and Fourteenth Amendments and Arizona law. *State v. Harrod (Harrod III)*, 218 Ariz. 268, 278-79 ¶¶ 37-39, 183 P.3d 519, 529-30 (2008); *State v. Garza*, 216 Ariz. 56, 70 ¶ 67, 163 P.3d 1006, 1020 (2007).